# UNITED STATES DISTRICT COURT

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

OCT - 6 2015

CLERK, U.S. DISTRICT COURT
By _____

Northern _____ DISTRICT OF    Texas

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)
Premises located at 3330 Webb Chapel Extension,
Apartment 5309, Dallas, Dallas County,
Texas as is more fully described in Attachment A, which is
attached hereto and incorporated by this reference.

APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT

Case Number: 3:15-MJ-750-BH

I, __SA Kenny Guzman (HSI),_____ being duly sworn depose and say:

I am a(n) __Special Agent with Homeland Security Investigations (HSI)_____ and have reason to believe
                                            Official Title

that ☐ on the person of or  ☑ on the property or premises known as (name, description and/or location)
3212 Storey Lane, Dallas, Dallas County, Texas

in the   Northern _____ District of    Texas,

there is now concealed a certain person or property, namely (describe the person or property to be seized)

SEE ATTACHMENTS B & C, WHICH ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE,

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

evidence and instrumentalities of a crime,

concerning a violation of Title  21 & 18 _____ United States code, Section(s)   846 & 1956h _____
The facts to support a finding of probable cause are as follows:
See attached Affidavit of Kenny Guzman (HSI),

Continued on the attached sheet and made a part hereof:        ☑ Yes      ☐ No

_____
Signature of Affiant                    Kenny Guzman (HSI),

Sworn to before me and subscribed in my presence,

October 6, 2015 _____        at    Dallas                    Texas
Date                                                  City                      State

Irma Carrillo Ramirez          U.S. Magistrate Judge        _____
Name of Judge                  Title of Judge               Signature of Judge

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS

I, Kenny Guzman, a Special Agent with Homeland Security Investigations (HSI), being duly sworn, state as follows:

### PREFACE

1. The following affidavit is furnished to support search warrants for the three locations, which are located in the Northern District of Texas. The suspected places and premises described and located as follows (See Attachment A):

   Location # 1:   **3851 Davila Drive, Dallas, Dallas County Texas.**

   Location # 2:   **3212 Storey Lane, Dallas, Dallas County, Texas.**

   Location # 3:   **3330 Webb Chapel Extension, Apartment 5309, Dallas, Dallas County Texas.**

2. Said suspected places and premises, in addition to the aforementioned descriptions, also include all other buildings, structures, places, and vehicles on said premises and within the curtilage of the residences, that are found to be under the control of the suspected parties named below and in, on, or around which said suspected parties may reasonably deposit or secret property that is the object of the search requested herein.

3. Based on the facts and circumstances contained in this affidavit, there is probable cause to believe that evidence, fruit, and instrumentalities of violations of federal law are contained at each location, including violations of Title 21, U.S.C. 846 conspiracy to possess with intent to manufacture and distribute a controlled substance, and Title 18, U.S.C. 1956(h), conspiracy to commit money laundering.

4. There is at said suspected places and premises personal property concealed and kept in violation of the laws of Texas and the United States and described as follows; evidence implicating the suspected parties of conspiring to distribute illegal controlled substances, in particular methamphetamine, and evidence related to the laundering of illegal drug proceeds. This evidence includes log books, records, payment receipts, notes, customer lists, ledgers, and other papers relating to the transportation, ordering, purchasing, processing, storage, and distribution of controlled substances; in particular methamphetamine. Records of assets, liabilities, income and

expenses log books.  Money believed to be the proceeds obtained from selling illegal drugs, and/or property believed to have been purchased with proceeds obtained from selling illegal drugs.

5. Computers, including but not limited to, the computer processing unit, printers, keyboards, monitors, modems, manuals, notebook computers, and all electronic storage media, and other components capable of being read by a computer, and media associated with the computer, which includes but is not limited to CDs, DVDs, electronic organizers, flash drives, removable hard disk drives and cartridges, laser disks, camera photo storage disks, and other media which is capable of storing magnetic coding.  Cellular telephones, SIM cards, and all stored data to include passwords, encryption keys, access codes, SIM passwords, files, programs, ring tones, pictures, videos, phone books, date books, call history, voice mail, e-mail, text messages, and geographical information.

6. Financial statements, tax statements, bank statements, canceled checks, deposit tickets, passbooks, money drafts, withdraw slips, certificates of deposit, letters of credit, loan and mortgage records, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, money wrappers, wire transfer applications and/or receipts, fictitious identification, and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money. Records of all assets purchased, obtained, and sold, all liabilities incurred or disposed of, and all expenditures paid either for the suspect, their nominees, or entities.

> *The evidence listed above this section consists of personal items that individuals, including drug traffickers, commonly keep within their residence.  These items often prove to be valuable evidence linking a suspect to the crimes they are accused of committing, as well as linking them to their co-conspirators.*

7. Said suspected places and premises are in charge of and controlled by each of the following persons:

**Suspected Location # 1-** (**3851 Davila Drive, Dallas, Texas**)
　　　　a.) Laura Zulema TORRES, a white female with a date of birth of 09-28-1986.
　　　　b.) Guillermo TORRES, a white male with a date of birth of 05-06-1992.

**Suspected Location # 2-** **(3212 Storey Lane, Dallas, Texas)**

    a.) Melvin SANCHEZ, a white male with a date of birth of 09-23-1977.

    b.) Luz TORRES, a white female with a date of birth of 12-14-1964.

    c.) Dany ACOSTA, a white male with a date of birth of 02-20-1985.

    d.) Ana TORRES, a white female with date of birth of 09/29/1988.

**Suspected Location #3 -** **(3330 Webb Chapel Ext, Apt 5309, Dallas, Texas)**

    a.) Luis XIMELLO, a white male with a date of birth of 07-23-1985.

8. It is the belief of Affiant, and he hereby charges and accuses that Melvin SANCHEZ, Luz TORRES, Dany ACOSTA, Ana TORRES, Luis XIMELLO, Laura Zulema TORRES, Guillermo TORRES, and Monica SALAZAR have knowingly and intentionally committed violations of 18 U.S.C. §§ 1956

## INTRODUCTION

9. I am a Special Agent with HSI and have been so employed since 2010. As such, my responsibilities include the investigation of federal crimes, including violations of Titles 18 and 21 of the United States Code. During the course of my employment with HSI, I have received training and gained experience in analyzing personal and business documents and records, as well as direct and indirect relationships between various types of personal and business records and documents, tax returns, and legal and illegal businesses and activities. I have also received training and gained experience in investigating the distribution of narcotics. I have been assigned to or have assisted other federal agents in investigations involving money laundering and drug trafficking.

10. Based on my training and experience, I am familiar with the methods and practices used by individuals and organizations involved in financial crimes and illicit activities that generate large amounts of income. These methods include cash purchases, the purchasing of numerous monetary instruments with cash in amounts at or below $10,000.00, the use of aliases and nominees, the use of businesses as "fronts" in an attempt to legitimize and conceal their activities.

11.  Based on my training, experience and my participation in this investigation and other investigations involving individuals engaged in structuring currency transactions, I know that individuals and/or businesses engaged in financial crimes often maintain documents and financial records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time. I also know that individuals and/or businesses keep some, if not all, of their records in electronic form, such as a computer. I know that documents and records can be in the form of printed documents or stored in computer memory or on computer disks or other computer storage mediums.

12.  There are many reasons why an individual will generally maintain records for a long period of time. The records will often seem innocuous because of their nature (e.g. financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes, photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software). Second, the individual may no longer realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence. Third, the individual(s) may also be under the mistaken belief that he/she has deleted, hidden or further destroyed computer-related evidence, which in fact, may be retrievable by a trained forensic computer expert. Lastly, it is common for individuals to set aside or store such records and because they generally have no immediate need for the records, they are often forgotten. To law enforcement, however, all these items may have significance and relevance when considered in light of other evidence.

13.  Based on my training and experience, I know that individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through various financial instruments.

14.  These financial instruments include but are not limited to cash, cashier's checks, money drafts, traveler's checks and wire transfers. Records of such instruments are often maintained at the individual's residence or place of business.

15. By virtue of training and experience, your Affiant has extensive knowledge in debriefing defendants, co-conspirators, witnesses and informants who have been involved in unlawful money laundering. These sources often have had personal experience involving the techniques and methods by which drug proceeds are laundered outside of the United States.

16. Affiant has reason to believe that drug traffickers/ money launderers often place assets in names other than their own to avoid detection of these assets by government and law enforcement agencies; drug traffickers/ money launderers often place assets in names of business/corporate entities as nominee title holders in order to avoid detection of these assets by government and law enforcement agencies; even though these assets are placed in the names of other persons or entities, the drug traffickers/ money launderers continue to use these assets and exercise dominion and control over them.  Drug traffickers/ money launderers must maintain and/or have quick access to large amounts of United States currency or other liquid assets in order to maintain and finance their ongoing illicit business.

17. Drug traffickers/ money launderers often maintain in their residences and/or business establishments records relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed including some or all of the following: electronically stored data, computerized or written books, records, receipts, diaries, notes, ledgers, cashiers' checks, money orders and other papers.

18. Drug traffickers/ money launderers commonly provide illegal controlled substances on consignment sale to their customers, who subsequently pay for the drugs after reselling said drugs.  Therefore, the above-mentioned books, records, receipts, notes, ledgers, etc., will be secured by the drug traffickers/ money launderers within their residences and/or their businesses for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs.

19. Drug traffickers/ money launderers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone numbers of drug associates within their residence and/or place of business, their business vehicles, or the curtilage of their residence or business for ready access and to hide them from law enforcement agencies.

20. Drug traffickers/ money launderers commonly keep multiple cellular telephones and SIM cards within their residence. Your Affiant knows that cell phones can contain a substantial amount of information relevant to the investigation of a case. Criminals often use cellular phones to communicate with accomplices and will sometimes store accomplices' contact information in address books, speed dial lists or in other areas of the phone. These communications can occur through typical telephone calls or through instant messaging or text messages. To the extent that criminals use services such as instant messaging or text messages, these messages can sometimes be found on the cellular phone itself. Criminals also use cellular phones to document criminal activities by photographs, videos as well as digital memos. Your Affiant knows that these images and memos are also stored on the handset itself. Also information can be located on the SIM (Subscriber Identity Module), which is a smart card located in the phone which also contains network information. Removable memories are also sometimes located in a cellular handset that allows the user to store vast amounts of electronic data. Your Affiant knows that devices such as these phones can store a large number of phone numbers and call history and some mobile phones can also contain contact information and calendar information and can be linked, either by wire or wireless, with computers. Camera phones can contain images. This information can be valuable evidence in determining other participants in a criminal enterprise. Your Affiant knows that those involved in criminal enterprises sometimes use multiple phones and multiple SIM cards to separate contacts with different participants or to attempt to avoid detection and monitoring by law enforcement. They also sometimes possess multiple phones to have a backup means of communication in case a phone is lost or seized by law enforcement. Likewise, Your Affiant knows that images in a camera can contain evidence of where a subject has been and with whom the subject has associated. Your Affiant, from his training and work experiences in the areas involving controlled substance violations, cash expenditures by drug traffickers, methods and modes of drug trafficking operations, and the efforts utilized by traffickers to conceal their assets and the information set forth here-in, knows that people engaged in the distribution of illegal drugs typically keep evidence linking them to their crime within their residence.

21. Your Affiant believes that the suspected locations contain documentary evidence linking Melvin SANCHEZ, Luz TORRES, Dany ACOSTA, Ana TORRES, Luis XIMELLO, Laura Zulema TORRES, Guillermo TORRES, and Monica SALAZAR to the distribution of illegal controlled substances, namely methamphetamine, money laundering, the expenditure of drug proceeds and the location/locations of said proceeds based upon the information contained in the following

paragraphs. The facts in this affidavit come from your Affiant's personal observations and/or knowledge, my training and experience, information obtained from other agents and witnesses, and from reliable and credible confidential informants, and reliable and credible cooperating defendants. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE FOR ISSUANCE OF SEARCH WARRANT

### INVESTIGATION SUMMARY

22. In September of 2013, HSI Dallas initiated an investigation and obtained information pertaining to the ESTRADA Money Laundering Organization /Drug Trafficking Organization (ESTRADA MLO/DTO). HSI received information from a Confidential Informant (CI) regarding Miguel Angel RIVAS-ESTRADA, an alleged methamphetamine distributor in the Dallas, Texas area. The CI stated that RIVAS-ESTRADA was frequently seen at **3212 Storey Lane, Dallas, TX 75220**. RIVAS-ESTRADA is originally from Michoacan, Mexico (MX) and is possibly working for the Caballeros Templarios (The Knights Templar) drug cartel. CI has been vetted by HSI and has provided information on criminal activities on several occasions. The information has been accurate. Affiant believes CI is credible and reliable.

23. Based on open source reporting and the affiants experience with assisting with narcotics investigations The Knights Templar Cartel is a cartel that formed after the split of the La Familia Michoacán cartel. The Knights Templar Cartel has taken control of Michoacán, MX and has been linked to the manufacturing, smuggling and the distribution of methamphetamine in the United States. Due to the RIVAS-ESTRADA MLO sending all their wire transactions to Michoacán, MX and showing their association to methamphetamine distributors it is believed they are working for and assisting The Knights Templar Cartel.

24. In October of 2013, The CI mentioned RIVAS-ESTRADA had been associated with Evelyn OJEDA. OJEDA stated to the CI (exact date unknown) that RIVAS-ESTRADA would bring narcotics from other states and store it in her apartment. The CI stated that OJEDA was currently incarcerated for transporting RIVAS-ESTRADA's narcotics. A record check on Evelyn OJEDA (AKA- Roxana RAMIREZ) revealed she was arrested in Arkansas on January 28, 2013 for

transporting approximately 48 pounds of methamphetamine. The CI identified Evelyn OJEDA from a photo taken at the time of OJEDA's arrest in Arkansas as the same person who supplied the information in the above paragraph.

25. In October of 2013, The CI mentioned that Monica SALAZAR worked for RIVAS-ESTRADA. SALAZAR stated to the CI that she was currently working as a money courier/ narcotics transporter for RIVAS-ESTRADA. SALAZAR stated she picked up packages containing large amounts of currency and, on some occasions, methamphetamine from several unidentified individuals in the Dallas, TX area. SALAZAR did not provide specific information on how many times she picked up packages or date and time to the CI. SALAZAR also stated she then transports the packages to **3212 Storey Lane, Dallas, TX 75220**. SALAZAR also mentioned she utilizes her Dodge Nitro to transport the packages.

26. On January 10, 2014, HSI Special Agents and DPD Officers conducted surveillance on **3212 Storey Lane** and observed a Honda Civic depart the residence. DPD Officer J. Kunzler stopped the vehicle due to a traffic violation and encountered Cynthia TORRES, Pedro RODRIGUEZ, and Guillermo TORRES. Cynthia TORRES stated the vehicle belonged to her and gave consent to search the vehicle and the results were negative. DPD Officer Kunzler discovered a rent receipt for Miguel ESTRADA and Karla CHAVEZ for a house located at **3851 Davila Drive, Dallas, TX**. TORRES could not show proof of ownership of the vehicle so TORRES's sister Laura TORRES, her mother Luz TORRES, and Luz TORRES's husband Melvin SANCHEZ arrived on scene to show proper documentation of ownership of the vehicle.

27. On January 10, 2014, surveillance at **3851 Davila Drive** revealed a black Chevy Camaro bearing license plate CHJ-4961 at ESTRADA's residence. Also at this location was a red Lexus bearing TX plate DC5-L529. CHJ-4961 is registered to Oneida PICASSO at 2802 Cody Ave, Mission, TX and DC5-L529 is registered to Ignacio Chavez GUEVARA at 1005 High Hill Place, Garland, TX 75041. A record check on 1005 High Hill Place revealed this residence and GUEVARA are currently under investigation by HSI and the Drug Enforcement Administration (DEA) for money laundering (HSI Case DA13CJ10DA0031).

28. On January 15, 2014, HSI Special Agent (SA) K. Guzman conducted surveillance on **3212 Storey Lane, Dallas, TX** and observed parked in front of the residence was a black Volkswagen with TX Plate CFG-6932. A record check revealed CFG-6932 is registered to Alejandro

MORAN-VILLEGAS. The record check also revealed that on December 11, 2013 an unidentified Hispanic male (UHM) drove this vehicle to a meet with HSI undercover agents. The UHM delivered approximately $110,000 U.S. dollars of suspected drugs proceeds (HSI Case DA02TR14DA0007).

29. On April 30, 2014, HSI Dallas with assistance from the Dallas County Sheriff's Office conducted surveillance on SALAZAR. At approximately 1530, HSI SAs J. Cronenworth, S. VanGeem and R. Martini witnessed SALAZAR's Dodge Nitro (BND-4049) parked in the southern-most part of the Home Depot parking lot located at 12005 Elam Rd, Balch Springs, TX 75180. At approximately 1550, a white, regular cab, Chevrolet Silverado bearing Texas plate BZP-2894 pulled up close to the Nitro (driver's window to driver's window). SA Cronenworth witnessed an exchange between the two drivers in which a blue bag was passed from the Silverado's driver to the Nitro's driver. The bag resembled a large plastic reusable grocery bag folded in half. SA Cronenworth could not see if anything was exchanged from the Nitro to the Silverado. The Nitro drove away as soon as the exchange occurred. At approximately 2026, SALAZAR's nitro arrived at **3212 Storey Lane** and departed **3212 Storey Lane** at approximately 2039. Based on affiants experience and training this activity is associated to the delivery of drug proceeds. Money couriers are known to meet drug traffickers in large parking lots as opposed to a residence in order to collect drug proceeds.

30. On April 30, 2014, the Silverado, mentioned above, was trafficked stopped at approximately 1706 due to a traffic violation by DCSO Trout. DCSO Trout identified the drive as Victor Hugo AGUILAR and the female as Margarita TORRES. DCSO Trout stated AGUILAR was acting very nervous during the traffic stop and stated his address was 2833 Canary Drive, Dallas, TX. When TORRES asked were they both resided she stated 2776 Ann Arbor, Dallas, TX. All subjects were released without further incident. On May 2, 2014, HSI Dallas received information based on a record check on AGUILAR and TORRES that they are subjects of a DEA investigation. The DEA stated that AGUILAR is a known money courier based on information obtained from their current investigation.

31. In May of 2014, HSI discovered SALAZAR and her associates mainly utilized the 5 Estrella's Super Mercado (Super Mercado) located at 9648 Overlake Drive, Dallas, TX 75220 to wire funds from suspected narcotic proceeds to MX. HSI has observed SALAZAR enter the store on several

occasions and remain in the store anywhere from one hour up to 3 hours. HSI observed SALAZAR inside the store and witnessed that she was the only individual inside the store wiring funds to MX. Based on affiant's experience and training this activity is associated to the laundering of drug proceeds via money service businesses (MSBs). Money couriers are known to utilized MSBs in order to conduct a large amount of wire transactions to MX. DTOs /MLOs have learned utilizing MSBs to launder drug proceeds has less risks then bulk cash smuggling the proceeds to MX.

32. In May of 2014, HSI obtained information from a Cooperating Defendant (CD-1) in regards to the ESTRADA MLO and information on another MLO utilizing the Super Mercado to wire suspected drug proceeds to MX. CD-1 stated from February of 2014 to May of 2014, he/she wired from approximately $40,000 to up to $50,000 U.S. dollars for Eloy VALENCIA (VALENCIA MLO) on a weekly basis. CD-1 also mentioned Armando TLASECA worked with VALENCIA as a money courier. CD-1 stated he/she was recruited by Laura Zulema TORRES to originally work for the ESTRADA MLO but was then told by TORRES that they would in fact be working for the VALENCIA MLO. CD-1 stated she visited TORRES at her house on **Storey Lane** (exact date unknown) and TORRES showed CD-1 packets of U.S. currency with each packet containing $1,000 U.S. dollars. TORRES stated to CD-1 that he/she would be wiring the money to MX. TORRES did not state the origin of the currency to CD-1 but when CD-1 asked if wiring the money was illegal TORRES stated yes.

33. CD-1 stated VALENCIA lived in an apartment complex located on the corner of Overlake Drive and Community in Dallas, TX. CD-1 could not remember what apartment number VALENCIA lived in. CD-1 stated he/she received the bulk cash from VALENCIA and that he/she is paid $200.00 U.S. dollars a day to wire funds to MX. CD-1 also stated that VALENCIA gives him/her the list of names that he/she will wire the funds to in MX. CD-1 mentioned he/she wires approximately $40,000 to $50,000 U.S. dollars a week for VALENCIA and TLASECA. CD-1 stated that VALENCIA stores the bulk cash he has in his apartment's air vents, a shoe box in his closet, and rolled up in clothes. CD-1 stated TLASECA's mother, Felipa TORRES, assist the VALENCIA MLO with laundering money to MX by utilizing her store, Cumbia Recordz, to wire the money to MX. CD-1 positively identified Laura Zulema TORRES, Melvin Sanchez, Monica SALAZAR, Luz TORRES, and Ana TORRES as money couriers who conduct a large amount of wire transactions from the Super Mercado. CD-1's information has been accurate. Affiant believes CD-1 is credible and reliable.

34. In May of 2014, HSI obtained information from CD-2 that Laura Zulema TORRES's and her family members were utilizing the Super Mercado to conduct a large amount of wire transactions to MX. CD-2 positively identified Laura Zulema TORRES, Monica SALAZAR, Ana TORRES, and Luz TORRES as individuals who conduct a large amount of wire transactions from the Super Mercado. CD-2 also at a later date identified Dany ACOSTA and Guillermo TORRES as individuals who conduct a large amount of wire transactions from the Super Mercado. CD-2's information has been accurate. Affiant believes CD-2 is credible and reliable.

35. On May 07, 2014, HSI Dallas and the Dallas County's Office conducted surveillance on SALAZAR. SALAZAR left her residence at approximately 1831 in her black Dodge Nitro and arrived at a Valero gas station on 12th street and Hampton Street, Dallas, TX. Agents witnessed Jonathan ANDRADE (SALAZAR's boyfriend) putting gas in the vehicle and get back into the driver seat with SALAZAR in the passenger seat. SALAZAR's vehicle departed the gas station and at approximately 1853 arrived at the Garibaldi Bazaar located at 9334 East R.L. Thornton Freeway, Dallas, and TX 75228. SA Guzman witnessed an UHM standing beside a maroon Jeep Cherokee with a plastic bag in his possession. The UHM approached SALAZAR's vehicle and handed the bag through the passenger window. Both vehicles subsequently left the parking lot of the Bazaar. SALAZAR's vehicle was then observed going straight to **3212 Storey Lane** without stopping anywhere after the meeting. SALAZAR's vehicle was observed leaving **3212 Storey Lane** at approximately at 1924. Based on information obtained on SALAZAR and the affiant's experience it is evident that SALAZAR obtained a package of suspected drug proceeds and delivered that package to **3212 Storey Lane, Dallas, TX**.

36. On May 13, 2014, HSI SAs Guzman, Cronenworth, Martini, and HSI Task Force Officer (TFO) K. Land conducted surveillance on SALAZAR. At approximately 1106, SALAZAR arrived at the Garibaldi Bazaar located at 9334 E R L Thornton Fwy, Dallas, TX 75228. Shortly a black Infiniti bearing TX plate DGN-5838 arrived at the bazaar being driven by an UHM. SA Guzman witnessed the vehicle pull up to SALAZAR's driver window and the UHM passed a plastic bag through his driver's window to SALAZAR. Once the package was delivered to SALAZAR both vehicles exited the parking lot. At approximately 1348, SALAZAR arrived at **3212 Storey Lane** and left at approximately 1350. Based on information obtained on SALAZAR and the affiant's experience it is evident that SALAZAR obtained a package of suspected drug proceeds and delivered that package to **3212 Storey Lane, Dallas, TX**.

37. On May 14, 2014, HSI SAs Guzman, Martini, J. Stephens, VanGeem, and P. O'Brien conducted surveillance on SALAZAR. At approximately 1822, SALAZAR was observed arriving at a Walgreens located at 438 West Illinois Avenue, Dallas, TX 75224. Agents then observed a silver Nissan Z bearing TX plate CXM-0194 arrive at the Walgreens and park next to the SALAZAR's passenger side. SAs Guzman and Martini witnessed the driver of the Nissan Z pass a blue box to SALAZAR, who was in the passenger seat and Jonathan ANDRADE was observed in the driver seat. Both vehicles left after the exchange was made. Agents conducted surveillance on the Nissan Z and SA Guzman observed Victor AGUILAR as the driver of the Nissan Z. SALAZAR was observed going straight to **3212 Storey Lane** without stopping anywhere else after the meeting and arrived at approximately 1846. SALAZAR left **3212 Storey Lane** at approximately 1904. Based on information obtained on SALAZAR and the affiant's experience it is evident that SALAZAR obtained a package of suspected drug proceeds and delivered that package to **3212 Storey Lane, Dallas, TX**.

38. On July 21, 2014, the owner of the Infiniti, mentioned above, was traffic stopped by the Dallas Police Department (DPD) due to a traffic violation. The driver was identified as Jesus PIMENTEL and he was arrested by DPD for a traffic violation. PIMENTEL was transported to the Dallas County Jail without incident.

39. On August 11, 2014, PIMENTEL was traffic stopped by DPD due to a traffic violation. PIMENTEL was driving a GMC Sierra and was travelling with two other Hispanic males. All three males were asked to exit the vehicle. DPD conducted a search of the vehicle due to the strong odor of marijuana. During the search of the vehicle 1000.9 grams of methamphetamine was discovered behind the glove compartment. All three subjects were arrested and transported to the Dallas County Jail without further incident.

40. On August 19, 2014, HSI received information from a Source of Information (SOI) that a silver Chrysler minivan bearing temporary TX tag 04K6317 was registered to Eloy VALENCIA's apartment 320 at the Lifestyle apartment complex located at 3635 Bolivar Drive, Dallas, TX 75220. The SOI also mentioned that apartment 320 was also where Armando TLASECA had his Toyota 4 Runner bearing TX tag DNV-3379 registered as a tenant.

41. On August 21, 2014, HSI agents observed TLASECA's Toyota 4 Runner and VALENCIA's Chrysler minivan arrive at the Lifestyle apartment complex at approximately 1110. During surveillance at the complex HSI SA Martini observed two Hispanic males in the parking lot. One Hispanic male was observed throwing away a plastic bag into the complex's dumpster. SA Martini then observed both males enter VALENCIA's Chrysler minivan and exit the location. SA Martini recovered the abandoned plastic bag from the dumpster. Inside the bag were a large amount of ripped up wire transaction receipts. An analysis of the receipts revealed approximately $241,300 U.S. dollars was wired to MX. Based on the affiant's experience and training this is evident of the laundering of suspected drug proceeds utilizing MSBs. Money couriers are known to utilize MSBs in order to conduct a large amount of wire transactions to MX in order to not risk bulk cash smuggling the proceeds to MX.

42. In September of 2014, HSI surveillance revealed VALENCIA was now residing at the Plaza de Lago apartment complex located at **3330 Webb Chapel Extension, Apartment 7209, Dallas, TX 75220**. HSI received leasing information from a SOI on apartment 7209. The SOI stated an individual named Jorge LOPEZ obtained resident parking stickers for VALENCIA's Chrysler minivan and TLASECA's 4 Runner. The SOI stated LOPEZ was residing in apartment 7209. Surveillance observed VALENCIA and TLASECA entering apartment 7209 and corroborated the SOI's information and showed it was accurate. Affiant believes the SOI is credible and reliable.

43. On November 25, 2014, a HSI CI working within the VALENCIA MLO alerted HSI agents that he/she was with TLASECA who was intending to wire $200,000 through the Super Mercado. TLASECA did in fact send approximately $150,000 in wire transfers from the Super Mercado and other locations. The CI also alerted HSI that TLASECA gave him/her a shoe box containing a large amount of U.S. currency in order to transport it from the Super Mercado. The CI exited the Super Mercado parking lot and the DPD conducted a traffic stop on the CI and in his/her possession was a shoe box containing $44,025. An Irving Police Department K-9 conducted a sniff test of the currency and alerted to the odor of narcotics. The CI also had in his/her possession 110 wire transfer receipts totaling $159,665. The CI has reported accurate information in the past that was corroborated by HSI surveillance. Affiant believes the CI is credible and reliable.

44. On November 27, 2014, HSI Dallas conducted a trash run on **3212 Storey Lane, Dallas, TX 75220**.  Below are items obtained from the trash run:

- A wire receipt from the money service business Sigue dated October 10, 2014.  The receipt was generated from the Super Mercado and had pin code 80170-766.
- A wire receipt for $970.00 U.S. dollars with the sender name as Melvin Augusto Gomez.
- A wire receipt from Sigue which was generated from the Super Mercado and had pin code 80170-765.
- Wire receipt for $930.00 U.S. dollars with sender name Francisco Murillo.
- Intermex receipt from Super Mercado dated November 07, 2014.  The receipt had sender name Jose Angel Madrigal.
- Sigue receipt from sender Victor Daniel Sanchez.
- Sigue receipt with the beneficiary as Rigoberto Villalobos Garcia.
- Wire receipt with beneficiary as Dionicio Cabrera Plancarte.
- Wire receipt with beneficiary as Hydee Sanchez Miranda with pin code 16707055478.

Based on the affiant's experience and training these receipts are evident of the laundering of suspected drug proceeds. Money couriers are known to utilize false names as the sender of wire transactions in order to not make their identity known and to not alert the MSB that the same person is sending multiple wire transactions in a short time frame. The individuals residing at **3212 Storey Lane** are known to frequently send wire transactions from the Super Mercado and a record check revealed the names above are not associated to the residence.

45. On December 04, 2014, HSI Dallas conducted a trash run on **3212 Storey Lane, Dallas, TX 75220**.  Below are items obtained from the trash run:

- Sigue wire receipt dated October 17, 2014 which was generated from the Super Mercado.
- T-Mobile billing statement for Laura TORRES with phone numbers 386-315-6492, 817-703-2444, and 972-330-7605.
- Groupex wire receipt with sender as Jose Gonzalez-Zamudio.

Based on the affiant's experience and training these receipts are evident of the laundering of suspected drug proceeds. Money couriers are known to utilize false names as the sender of wire transactions in order to not make their identity known and to not alert the MSB that the same

person is sending multiple wire transactions in a short time frame. The individuals residing at **3212 Storey Lane** are known to frequently send wire transactions from the Super Mercado and a record check revealed the names above are not associated to the residence.

46. On December 23, 2014, HSI agents received information that VALENCIA's apartment, located at **3330 Webb Chapel Extension, Apt 7209, Dallas, Texas, 75220**, was vacant and that abandoned property was present. The lease agreement for apartment 7209 revealed that the apartment was leased to LOPEZ, and TLASECA's vehicle was included as a vehicle associated to the lease. HSI retrieved the abandoned property and found several wire transfer receipts. The wire receipts found in the abandoned apartment totaled $74,825. The wire transfers occurred from September 17, 2014, to October 13, 2014, and ranged from $880 to $1,000. Based on the affiant's experience and training this is evident of the laundering of suspected drug proceeds utilizing MSBs. Money couriers are known to utilize MSBs in order to conduct a large amount of wire transactions to MX in order to not risk bulk cash smuggling the proceeds to MX.

47. In January of 2015, HSI obtained information from CD-3. CD-3 stated several individuals were visiting Monica's Hair Salon located at 9530 Overlake Drive, Dallas, TX 75220 and utilizing MD Income Tax Multiservices (located inside the hair salon) to conduct a large amount of wire transactions. CD-3 positively identified Ana TORRES, Luz TORRES, Melvin SANCHEZ, Laura Zulema TORRES, and Monica SALAZAR as individuals who visit the hair salon in order to conduct a large amount of wire transactions to MX. CD-3's information has been accurate. Affiant believes CD-3 is credible and reliable.

48. On January 26, 2015, HSI Dallas and the Dallas County Constable Department Precinct 3 conducted surveillance on SALAZAR. At approximately 0858, SALAZAR's black Dodge Nitro arrived at **3851 Davila Drive, Dallas, TX** and it left at approximately 0924. At approximately 0940, SALAZAR's vehicle arrived at a Fiesta parking lot located at 1145 West Airport Freeway, Irving, TX 75062. HSI SA Guzman observed SALAZAR waiting in the parking lot. At approximately 1032, a black Ford Focus bearing TX tag FBF-3955 was observed parking next to SALAZAR's vehicle. SA Guzman observed a Hispanic male exit the Focus and enter SALAZAR's vehicle subsequently the Hispanic male exited SALAZAR's vehicle and entered the Focus. Both vehicles then departed the Fiesta parking lot. HSI surveillance showed SALAZAR

went straight back **3851 Davila Drive** without stopping anywhere else and arrived at approximately 1046. This activity is evident that the suspected drug proceeds SALAZAR is picking up is now being delivered to **3851 Davila Drive, Dallas, TX**. Based on the affiant's experience and training DTOs / MLOs are known to change stash house locations and swap between stash houses in order to avoid detection of the stash house.

49. On March 16, 2015, HSI Dallas along with the Irving Police Department (PD), Rowlett PD, and Lancaster PD conducted surveillance on VALENCIA. VALENCIA was now residing in apartment 232 at the Villas Del Lago Apartment complex located at 2911 Clydedale Drive, Dallas, TX 75220. VALENCIA was observed entering a silver Toyota Sienna bearing TX tag FLM-0614 with a small T-Mobile bag in his possession. VALENCIA departed the complex and at approximately 1322 arrived at Cumbia Recordz. VALENCIA was observed entering Cumbia Recordz with the T-Mobile bag. At approximately 1342, VALENCIA exited the store without the T-Mobile bag and departed the location in the Sienna. Eloy VALENCIA was observed returning to the Villas Del Lago complex. VALENCIA was observed exiting the complex once again and at approximately 1457, VALENCIA returned to Cumbia Recordz in the Sienna and was observed entering the store with a large and bulky manila envelope. At approximately 1530, Eloy VALENCIA exited the store without the envelope and departed the location.

50. On April 02, 2015, HSI Dallas along with Rowlett PD, Dallas PD, and Lancaster PD conducted surveillance on Jorge LOPEZ and VALENCIA. Surveillance revealed that LOPEZ and VALENCIA moved from the Villas Del Lago Apartment complex and were now residing at Bayou Bend Apartment complex located at 3353 Lombardy Lane, Dallas, TX 75220. SA Guzman witnessed LOPEZ exiting a breeze way at the Bayou Bend Apartment complex. LOPEZ had in his possession a brown paper bag and was observed placing the bag inside the Sienna. LOPEZ was then seen exiting the complex in the Sienna and travelled westbound on Lombardy Lane. LOPEZ was traffic stopped by DPD due to a traffic violation. DPD Officer K. Gladden identified the driver as LOPEZ. LOPEZ stated he did not have a valid driver's license or any other proper identification. LOPEZ also stated he was present in the U.S. illegally. LOPEZ gave verbal consent to the search of the Sienna and the brown paper bag was discovered behind the center console between the driver and passenger seat.

51. LOPEZ stated he only spoke Spanish and SA Guzman came on the scene to speak with LOPEZ. LOPEZ stated to SA Guzman that he lost all his identification cards and all he had was a print out of his Mexican electoral card. LOPEZ stated he lived at 2911 Clydadale Drive, Apartment 232, Dallas, TX. LOPEZ also stated he lived there with some friends who did construction with him. LOPEZ mentioned he lived in this apartment for five (5) months. A record check on LOPEZ revealed he was detained on three occasions for attempting to illegally enter the U.S. from MX and was voluntarily removed on every occasion. LOPEZ was placed under arrest by HSI for immigration violations. LOPEZ was transported to the Immigration office in Dallas, TX by HSI SAs J. Stephens and P. O'Brien.

52. SA Guzman inventoried the Sienna in order for the vehicle to be towed. SA Guzman removed the brown paper bag which contained a large bundle wrapped with blue gift tissue paper. The bundle contained a large amount of U.S. currency. The large bundle was made up of smaller bundles which were separately wrapped with rubber bands. Based on the agent's experience this is indicative of the transportation of narcotic proceeds.

53. HSI TFO and Fate DPS K-9 Officer M. Rollins conducted an inspection on the currency with K-9 Czar. K-9 Czar produced a positive narcotic alert to the U.S. currency seized from LOPEZ. The U.S. currency was counted at the HSI Dallas field office and totaled approximately $15,086 U.S. dollars.

54. On May 15, 2015, HSI Dallas received information from CD-3 that Luis XIMELLO was now working for the VALENCIA MLO. CD-3 stated XIMELLO entered Monica's Hair Salon located at 9530 Overlake Drive, Dallas, TX 75220 in order to purchase insurance for a Honda Accord. CD-3's information has been corroborated and affiant believes CD-3 is credible and reliable.

55. On June 12, 2015, CD-3 stated to HSI that XIMELLO visited Monica's Hair Salon. XIMELLO stated his new residence was at the Plaza de Lago located at **3330 Webb Chapel Extension, apartment 5309, Dallas, TX 75220**. XIMELLO provided CD-3 with a vehicle registration receipt that stated the Honda Accord mentioned above now had TX Tag FRD-9104 and was registered to XIMELLO at **3332 Webb Chapel Extension, apartment 5309, Dallas, TX 75220**. XIMELLO also stated to CD-3 that VALENCIA had returned to MX.

56. On July 22, 2015, HSI Dallas along with the Lancaster PD, and the Rockwall County Sheriff's Office (SO) conducted surveillance on SALAZAR. SALAZAR was observed arriving in her black Dodge Nitro at **3851 Davila Drive, Dallas, TX 75220**. SALAZAR was observed sitting in her vehicle while parked in front of the residency. A short time later Laura Zulema TORRES's white Chevy Tahoe, bearing TX tag DSV-6891, was seen arriving at the residence. SALAZAR did not exit her vehicle and she departed the residence once the Tahoe arrived.

57. SALAZAR was observed travelling southbound on Marsh Lane then was seen driving thru a large parking lot. SALAZAR did not stop at any of the stores located in the parking lot and then drove northbound on El Centro Drive. At approximately 1337, SALAZAR was observed arriving at the Fox gas station located on the corner of Webb Chapel Road and Lombardy Lane, Dallas, TX. SALAZAR was then seen exiting the store located in the gas station and was then seen putting gas in her vehicle.

58. Rockwall County SO Detective and HSI TFO S. Young witnessed SALAZAR frequently checking her surroundings while putting gas into her car. Once SALAZAR was done at the gas pump she drove to the large parking lot behind the gas station. SALAZAR was observed sitting in her car and facing northbound onto Lombardy Lane. A short time later a silver Chevy Cobalt, bearing TX tag DM6-Y184, was observed parking next to SALAZAR's vehicle. An UHM was observed in the driver seat. SA Guzman observed SALAZAR'S driver window was down and SALAZAR was leaning out her driver window while the Cobalt's passenger window was down and the Hispanic male was seen leaning over the passenger seat (Investigator Note: Due to the congestion of the parking lot agents and officers were not able to physically observe a package being given to SALAZAR or vice versa. Based off of SALAZAR's modus operandi it is very likely she obtained a package from the Hispanic male in the Cobalt). At approximately 1348, SALAZAR's vehicle was observed arriving at **3212 Storey Lane, Dallas, TX 75220**. This activity is evident that the suspected drug proceeds SALAZAR is picking up is now being delivered to **3851 Davila Drive, Dallas, TX**.

59. On July 23, 2015, HSI conducted surveillance on XIMELLO's Honda Accord. The vehicle departed the Plaza de Lago and at approximately 1534, HSI TFO S. Young and Rockwall SO Detective Havens observed the Honda Accord arrive and park in front of Cumbia Recordz. The vehicle was driven by an older Hispanic male. Observed exiting the vehicle was a younger, heavy set Hispanic male wearing a black shirt, with dark facial hair who was riding in the front

passenger seat. The younger male exited the vehicle carrying a small blue back pack and was seen entering Cumbia Recordz. At approximately 1535 pm the male exited the store without the back pack.

60. On July 28, 2105, at approximately 1530 HSI with the assistance of Rockwall County SO and Lancaster PD conducted surveillance on the blue Honda Accord. The Accord was observed leaving the Plaza de Lago and was then seen travelling southbound on loop 12. The Accord then arrived at a Fiesta Supermarket parking lot located on the north side of Irving Boulevard in Irving, TX. The vehicle was observed parking alongside a white Ford F-150 bearing MX tag 863-ZNJ.

61. The passenger of the Accord then exited the vehicle and walked up to the passenger window of the Ford F-150. After a brief moment he returned to the Accord and the Ford F-150 departed the parking lot subsequently the Accord then exited the parking lot. The Accord returned to the Plaza de Lago. A record check on the Ford F-150 revealed the vehicle is associated with a DEA target which is being investigated for the distribution of methamphetamine.

62. On August 25, 2015, HSI surveillance observed SALAZAR's Dodge Nitro in a parking lot located on Samuell Boulevard and South Buckner Boulevard, Dallas, TX (Investigator Note: SALAZAR has been observed at this location in the past meeting with unknown individuals and receiving packages from these unknown individuals and delivering the packages to **3212 Storey Lane**).

63. SALAZAR's vehicle then departed this location and arrived at **3851 Davila Drive, Dallas, TX 75220**. SALAZAR was observed exiting her vehicle and entering the residence. A short time later she exited the residence and walked back to her vehicle. SALAZAR was then observed opening her driver door and retrieving a red package and returning to the residence. SALAZAR entered the residence and after a short time she exited the residence without the red package and departed the residence in her vehicle.

64. On September 17, 2015, HSI SA Guzman was notified by the DEA TFO M. Jackson. TFO Jackson stated he was assigned to the DEA in Tulsa, Oklahoma. TFO Jackson stated his office currently had arrested two subjects for transporting approximately five (5) kilograms of

methamphetamine in a black Volkswagen Jetta which was registered to **3851 Davila Drive, Dallas, TX 75220**. A record check on this vehicle's VIN number revealed it is the same Volkswagen mentioned in paragraph 28.

65. The Internal Revenue Service (IRS) has been assisting on this money laundering organization and they have discovered based on source reporting, seized records, abandoned property and subpoenaed records of MSBs that the ESTRAD and VALENCIA MLO are responsible for laundering approximately 17.2 million U.S. dollars to MX during the time frame of this investigation. The IRS subpoenaed records from MD Income Tax Multiservices (MDIM) and an analysis revealed that of the 5,689 wire transfers initiated from MDIM, 4,742 of them totaling $4,732,085 were wire transfers that were at least $900. CD-3 stated that the majority of the wire transfers over $900 were sent by Ana TORRES, Luz TORRES, Melvin SANCHEZ, Laura Zulema TORRES, and Monica SALAZAR, Eloy VALENCIA, Jorge LOPEZ, and Armando TLASECA.

66. CD-2 has been cooperating with law enforcement since May of 2014. CD-2 stated Ana TORRES, Luz TORRES, Melvin SANCHEZ, Laura Zulema TORRES, Monica SALAZAR, and Armando TLASECA routinely came into the Super Mercado to conduct wire transfers. CD-2 had observed and reported that the individuals mentioned above collectively wired approximately $4,066,028 U.S. dollars utilizing the Super Mercado. CD-2's information was corroborated by subpoenaed records of the MSBs by the IRS.

67. Based on surveillance the affiant knows the individuals mentioned above and their associates are still utilizing MSBs in order to launder suspected drug proceeds via wire transactions. Based on trash runs, abandoned property linked to the VALENCIA MLO, and surveillance conducted on the ESTRADA and VALENCIA MLO your affiant believes bulk US currency, wire transactions, and documentary evidence of drug trafficking and money laundering will be found in the three suspected locations.

## A.   SUSPECTED LOCATIONS:

**Suspected Location # 1**- (3851 Davila Drive, Dallas, Dallas County Texas)

68. Surveillance operations conducted since October of 2014 have identified **Suspected Location # 1** as Laura Zulema TORRES and Guillermo TORRES's primary residence.  Laura and Guillermo have been observed coming and going from **Suspected Location # 1** in a vehicle that is registered in her (TORRES's) name, and that is registered to **Suspected Location # 2's** address.

69. As described in this affidavit, this investigation has identified Laura Zulema TORRES and Guillermo TORRES as money couriers for the ESTRADA DTO/MLO.  Specifically, Laura TORRES has been identified by three cooperating defendants as being responsible conducting a large amount of wire transactions to Mexico.

70. Your Affiant knows from his training and work experiences investigating drug traffickers and money launderers that persons involved in the distribution of illegal drugs often keep ledgers and customer lists that detail amounts of drugs sold, and any credits and/or money owed to the DTO/ MLO by their customers within the distributors' residences. Your Affiant believes that TORRES's role in collecting drug proceeds for this DTO/ MLO would likely require that he keep the aforementioned detailed ledgers or list in order to track drug money owed.

71. Your Affiant believes that **Suspected Location # 1** will contain cellular telephones/push-to-talk phones, SIM cards, computers, financial information, receipts and bills of sales related to the purchase of real estate and other personal property, pictures, letters, ledgers, and bulk US currency amongst the other documentary evidence of drug trafficking, money laundering, the expenditure of drug proceeds, and/or the location/locations of said proceeds listed within Attachment B, linking Laura Zulema TORRES and Guillermo TORRES to violations 21 U.S.C. §§ 846, and  18 U.S.C. §§ 1956.

**Suspected Location # 2**- (3212 Storey Lane, Dallas, Dallas County, Texas)

72. Public database reports, physical surveillance, and trash runs have been used to identify **Suspected Location # 2** as Luz TORRES and her husband, Melvin SANCHEZ's, residence. The

Dallas County Central Appraisal District shows **Suspected Location # 2** to be owned by both TORRES and SANCHEZ.  Melvin SANCHEZ purchased the home in 2007.

73. Two "trash runs" at the suspected location have been conducted.  A trash run is a law enforcement technique of searching for evidence of a crime within a suspect's trash that has been abandoned.  The items found are referenced in paragraphs 44 and 45.

74. Your Affiant, from his training and work experiences in the areas involving controlled substance violations, cash expenditures by drug traffickers, methods and modes of drug trafficking operations, and the efforts utilized by traffickers to conceal their assets and the information set forth here-in, knows that people engaged in the distribution of illegal drugs typically keep evidence linking them to their crime within their residence.  Specifically, your Affiant believes that **Suspected Location # 2** will contain cellular telephones/push-to-talk phones, SIM cards, computers, financial information, receipts and bills of sales related to the purchase of real estate and other personal property, pictures, letters, ledgers, and bulk US currency amongst the other documentary evidence of drug trafficking, money laundering, the expenditure of drug proceeds, and/or the location/locations of said proceeds listed within Attachment B, linking Melvin SANCHEZ, Luz TORRES, Dany ACOSTA, and Ana TORRES to violations of 21 U.S.C. §§ 846, and  18 U.S.C. §§ 1956.

**Suspected Location # 3**- **(3330 Webb Chapel Extension, Apartment 5309, Dallas, Dallas County,Texas)**

68. This location is being leased by Luis XIMELLO. A lease agreement obtained by HSI shows XIMELLO is the sole occupant of this apartment. XIMELLO's current vehicle also shows this as the vehicle's registered address.

69. Investigators believe XIMELLO is storing assets purchased with drug proceeds within **Suspected Location # 3**.  Based on items found in the VALENCIA MLO's previous stash apartments Investigators believe they will discover evidence of a large amount of wire transactions, drug proceeds and drug ledgers.

70. Your Affiant, from his training and work experiences in the areas involving controlled substance violations, cash expenditures by drug traffickers, methods and modes of drug trafficking operations, and the efforts utilized by traffickers to conceal their assets and the information set forth here-in, knows that people engaged in the distribution of illegal drugs typically keep

evidence linking them to their crime within their residence.  Specifically, your Affiant believes that **Suspected Location # 3** will contain cellular telephones/push-to-talk phones, SIM cards, computers, financial information, receipts and bills of sales related to the purchase of real estate and other personal property, pictures, letters, ledgers, and bulk US currency amongst the other documentary evidence of drug trafficking, money laundering, the expenditure of drug proceeds, and/or the location/locations of said proceeds listed within Attachment B, linking Luis XIMELLO to violations of 21 U.S.C. §§ 846, and  18 U.S.C. §§ 1956.

## CONCLUSION

71.   Your Affiant believes that probable cause exits to believe that **Suspected Locations # 1-3** contain fruits, instrumentalities, and evidence linking Melvin SANCHEZ, Luz TORRES, Dany ACOSTA, Ana TORRES, Luis XIMELLO, Laura Zulema TORRES, and Guillermo TORRES to violations 21 U.S.C. §§ 846 and 18 U.S.C. §§ 1956.

Wherefore, Affiant asks for issuance of a warrant that will authorize him to search said suspected place and premises for said personal property and seize the same.

_____
Kenny Guzman
Special Agent
HSI

Subscribed and sworn to before me by said affiant on this the ____6th____ day

Of __October____ , 2015.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF TEXAS

# ATTAHCMENT "A"

**Suspected Location # 1** is described as a single family, one story residence constructed of grey wooden wallas, and a brown colored composition roof. The front door is white in color, and the numerals "3851" are attached to the wall to the right of the front door. **The address of Suspected Location # 1 is 3851 Davila Drive, Dallas, Dallas County, Texas.** This is an address that is located within the Northern District of Texas

Said suspected places and premises, in addition to the aforementioned descriptions, also includes all other buildings, structures, places, and vehicles on said premises and within the curtilage of the residences, that are found to be under the control of the suspected parties named below and in, on, or around which said suspected parties may reasonably deposit or secret property that is the object of the search requested herein.



**Suspected Location # 2** is described as a single family, one story residence constructed of beige colored walls and a brown colored composition roof.  The front door is brown in color, and the numerals "3212" are displayed on a wooden plaque located to the left of the front door. **The address of Suspected Location # 2 is 3212 Storey Lane, Dallas, Dallas County, Texas.** This is an address that is located within the Northern District of Texas.

Said suspected places and premises, in addition to the aforementioned descriptions, also includes all other buildings, structures, places, and vehicles on said premises and within the curtilage of the residences, that are found to be under the control of the suspected parties named below and in, on, or around which said suspected parties may reasonably deposit or secret property that is the object of the search requested herein.



**Suspected Location # 3** is described as one bedroom apartment.  The front door is a wooden framed door. The front door is grey in color, and the numerals "5309" are attached to the the front door. **The address of Suspected Location # 3 is 3330 Webb Chapel Extension, Apartment 5309, Dallas, Dallas County, Texas**.  This is an address that is located within the Northern District of Texas.

Said suspected places and premises, in addition to the aforementioned descriptions, also includes all other buildings, structures, places, and vehicles on said premises and within the curtilage of the residences, that are found to be under the control of the suspected parties named below and in, on, or around which said suspected parties may reasonably deposit or secret property that is the object of the search requested herein.



## ATTACHMENT B

Based on the information contained in this affidavit, I respectfully submit that there is probable cause to seize the following items, described in Attachment B, which constitute evidence, fruits, and instrumentalities of Title 21, U.S.C. 846, and Title 18, U.S.C. 1956(h):

1. The following records are to be seized from the time period of January 2010 to the present:

   a. U.S. Currency, financial instruments, financial instruments purchased with currency in the sum of $1,000.00 or more, precious metals, jewelry and/or other items of value and/or proceeds of illegal drug transactions and evidence of financial transactions relating to obtaining, transferring, laundering, secreting or spending large sums of money made from engaging in illegal Controlled Substance activities;

   b. Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning the transportation, ordering, sale, and distribution of illegal controlled substances and/or records relating to the receipt, disposition, and laundering of proceeds from the distribution of illegal controlled substances;

   c. Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning Leahs Cosmetic and Accessories, and any other entity that these individuals may be involved with;

   d. Bank and other financial institution records, including bank statements, passbooks, deposit slips, withdrawal slips, money wrappers, cancelled checks, bank receipts, bank checks, money order receipts, wire transfers, credit and debit memos, and safe deposit keys and records;

   e. Bank and other financial institution records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency;

   f. Records of loans or letters of credit including contracts, mortgages, notes, agreements, applications, payments, and financial statements;

   g. Credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

h. Records of expenditures including payments, receipts, invoices, and statements;

i. Records of income to include: tax returns, cash receipts, receipt books, copies of checks and deposit slips;

j. Employment records and personnel files including payroll journals, payroll records and correspondence that indicate payments to employees;

k. Information concerning suppliers for Leahs Cosmetic and Accessories, and any invoices, receipts, or payments made to such suppliers;

l. Any and all correspondence between employees/members/owners concerning normal business activity, such as sales, expenditures, investments, current and potential clients and/or transfer of funds;

m. Records, documents, titles, mortgage paperwork, and deeds reflecting the purchase, rental or lease of any real estate, and vehicles such as a car, truck, motorcycle, boat, plane, RV, and equipment.

2. Telephone paging devices, beepers, mobile telephones, car telephones, and other communication devices.

3. Indicia of occupancy, residency, rental or ownership of the premises to be searched, including but not limited to utility bills, telephone bills, loan payments receipts, rent receipts, trust deeds, lease or rental agreements, and escrow documents.

4. Keys to show ownership of storage facilities, businesses, locked containers, cabinets, safes, conveyances and/or other residences.

5. Photographs, including still photographs, negatives, video tapes, films, slides, of individuals, property and illegal controlled substances including video recordings, in particular photographs of co-conspirators, of assets, illegal controlled substances, and proceeds;

# ATTACHMENT C

ITEMS TO BE SEIZED RELATED TO ELECTRONIC DEVICES

Items to be seized at Locations 1-3.

The following described items and records to be seized (also described in the affidavit of SA Kenny Guzman, which is herein incorporated to this warrant by reference) are those records for the period of January 1, 2008 through the present, relating to Locations 1, 2, and 3.

Electronic devices which are capable of storing, analyzing, creating, displaying, converting or transmitting electronic or magnetic computer impulses or data that is contained in this warrant. These devices include:

1. Any computers, or electronic devices, including cell phones and tablet computers, that were or may have been used as a means to commit the offenses described on the warrant, or that were or may have been used to store or contain evidence of said offenses.

2. For any computer, storage device, or other electronic media (hereinafter, "MEDIA" and inclusive of cell phones and tablet computers) that is called for by this warrant, or that might contain things otherwise called for by this warrant:

a. records, documents, or materials of user attribution showing who used or owned the MEDIA at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, and browsing history;

b. passwords, encryption keys, and other access devices that may be necessary to access the MEDIA or data;

c. computer software, applications, or programs that may be necessary to access the MEDIA or data.

d. documentation and manuals that may be necessary to access the MEDIA or to conduct a forensic examination of the MEDIA.

3. Records and things evidencing the use of the Internet Protocol address [[e.g. 10.19.74.69]] to communicate with the Internal Revenue Service including:

a. routers, modems, and network equipment used to connect computers to the Internet;

b. records of Internet Protocol addresses used;

c.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3. As used above, the term "records", "documents", and "materials" includes items in whatever form and by whatever means, the records, documents, or materials, and their drafts, or their modifications may have been created or stored.